GARCIA V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-194-CR

ARTHUR DENNIS GARCIA APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Appellant Arthur Dennis Garcia appeals from his conviction and forty-five-year sentence for murder.  In three points, he challenges the legal and factual sufficiency of the evidence and the trial court’s denial of his request for a manslaughter instruction in the jury charge.  We affirm.

Background Facts
(footnote: 2)
 Appellant and a friend, Robert Bigler, went to Bobby Cherrnay’s house in the early morning hours of July 3, 2003 and assaulted Cherrnay.  Cherrnay’s roommate found him dead later that morning.  Cherrnay’s body had numerous striped, bruising wounds on the right side and a stab wound to the right buttock that had “bled out.”

The State charged appellant with the capital murder of Cherrnay.  The indictment alleged that in the course of committing or attempting to commit burglary of a habitation, appellant intentionally caused Cherrnay’s death by striking Cherrnay with “a golf club or other long thin object,” by striking Cherrnay with his hand, by stabbing Cherrnay with an object unknown to the grand jury, by shocking Cherrnay with a stun gun, or “by a combination of striking, stabbing, and/or shocking . . . Cherrnay in the manner or manners alleged” in the indictment. 

Appellant pled not guilty, and the case was tried to a jury.  The trial court included instructions on the lesser-included offense of murder in the jury charge, and the jury found appellant guilty of murder. 

Sufficiency Points

In his first two points, appellant challenges the legal and factual sufficiency of the evidence to prove that he intended to kill or seriously injure Cherrnay.
  
Specifically, appellant contends that because the evidence showed that none of Cherrnay’s wounds would have been fatal by themselves, the evidence is insufficient to show that appellant acted with intent or knowledge to cause death or serious bodily injury.

Legal Sufficiency Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).  
This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case.  
Malik v. State
, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); 
Bowden v. State
, 166 S.W.3d 466, 470 (Tex. App.—Fort Worth 2005, pet. ref’d).  Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State’s theories of liability, and adequately describes the particular offense for which the defendant was tried.  
Gollihar v. State
, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); 
Malik, 
953 S.W.2d at 240.  The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument.  
See Curry
, 30 S.W.3d at 404.

The standard of review is the same for direct and circumstantial evidence cases.  
Burden v. State
, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).  
In a sufficiency review, the jury’s inference of intent is afforded more deference than the evidence supporting proof of conduct.  
Margraves
, 34 S.W.3d at 919.  Circumstantial evidence of a defendant’s guilty knowledge is not “required to meet the same rigorous criteria for sufficiency as circumstantial proof of other offensive elements.”  
Id
. (quoting 
Brown v. State
, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995)). In determining the legal sufficiency of the evidence to show an appellant’s intent, and faced with a record that supports conflicting inferences, we “must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution.”  
Matson v. State
, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

Factual Sufficiency Standard of Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.  
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict.  
Watson
, 204 S.W.3d 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn [the] conviction.”
 
 Id
.  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.  
Id
.  We may not simply substitute our judgment for the fact-finder’s.  
Johnson
, 23 S.W.3d at 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.” 
Johnson
, 23 S.W.3d at 8.  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”  
Id
. at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  Moreover, an opinion reversing and remanding on factual insufficiency grounds must detail all the evidence and clearly state why the finding in question is factually insufficient and under which ground.  
Goodman v. State
, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); 
Johnson
, 23 S.W.3d at 7.

The Charge

The trial court’s jury charge included instructions on (1) capital murder, as both a principal and a party, by striking Cherrnay with a golf club, other long thin object, or appellant’s hand “in combination with stabbing . . . Cherrnay with an object unknown to the [g]rand [j]ury”; and (2) murder, as both a principal and a party, by either (a) intentionally or knowingly causing Cherrnay’s death by striking Cherrnay with a golf club, other long thin object, or appellant’s hand in combination with stabbing Cherrnay with an object unknown to the grand jury; (b) with intent to cause serious bodily injury, causing Cherrnay’s death by committing an act clearly dangerous to human life:  striking Cherrnay with a golf club, other long thin object, or appellant’s hand; stabbing Cherrnay; or “by a combination of striking and/or stabbing . . . Cherrnay”; (c) while committing or attempting to commit aggravated assault or burglary of a habitation, causing the death of Cherrnay by committing an act clearly dangerous to human life; or (d) while conspiring to commit a felony—aggravated assault or burglary of a habitation—and in carrying out or attempting to carry out the conspiracy, committing a felony by 1) intentionally or knowingly causing Cherrnay’s death by striking him with a golf club, other long thin object, or hand in combination with stabbing him with an object unknown to the grand jury or 2) with intent to cause serious bodily injury, committing an act clearly dangerous to human life, as described above.  The charge did not require the jury to differentiate among the different methods of murder charged.  The judge also charged the jury on the offense of burglary of a habitation, as both a principal and a party. 

Applicable Law

Murder

Penal code section 19.02(b) describes three different ways of committing murder:

(b) A person commits an offense if he:

(1) intentionally or knowingly causes the death of an individual;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual;  or

(3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

Tex. Penal Code Ann.
 § 19.02(b) (Vernon 2003).  

Intent

Penal code section 6.03 defines the intentional and knowing mental states as follows:

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Id.
 § 6.03(a),(b) (Vernon 2003).

Intent can be inferred from the acts, words, and conduct of the accused.  
Patrick v. State
, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995), 
cert. denied
, 517 U.S. 1106 (1996).  It can also be inferred from the means used and the wounds inflicted.  
Womble v. State
, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981); 
Yanez v. State
, 199 S.W.3d 293, 311 (Tex. App.—Corpus Christi 2006, pet. ref’d).  Intent may also be inferred from acts indicating a consciousness of guilt.  
See Claxton v. State
, 124 S.W.3d 761, 766 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d); 
cf. Montgomery v. State,
 810 S.W.2d 372, 396 (Tex. Crim. App. 1991) (op. on reh’g) (noting that appellant’s intent to arouse and gratify his own desire could be inferred by his consciousness of wrongdoing, as evidenced by his telling children not to reveal to anyone what had happened).

Applicable Facts

The evidence at trial showed that Cherrnay had been harassing and threatening Dawn Sellers, appellant’s girlfriend, who was pregnant with appellant’s child at the time.
(footnote: 3)  On the night of July 2, 2003, appellant and Dawn, along with Bigler and another friend, went to Dawn’s brother Erik’s house to swim.  While at Erik’s, appellant and Bigler discussed going over to Cherrnay’s house.  According to Erik, no one talked about killing Cherrnay, just about talking to him.  At some point, Erik pulled appellant aside and told him to go home, cool down, and not do anything. 

Nigel Renfro, an officer with the Carrollton police department, testified that around 2:45 a.m. on July 3, 2003, he stopped a car that had been speeding and had also run a stop sign.  Appellant, who was driving, was very nervous, breathing heavily, and his hand was trembling.  Officer Renfro also noticed an abrasion on appellant’s left knuckle, small spots of blood on both hands, and what appeared to be mud on both knee areas and on his shoes.  Appellant told Officer Renfro that he got the abrasion from wrestling in his friend’s backyard. 

Appellant’s passenger, Bigler, had the same type of spots of what appeared to be mud on his knees, and he had blood on his shirt and in the corner of his mouth.  He also had small amounts of blood on his hands.  He did not appear to have any cuts or abrasions that would have caused the bleeding, and Officer Renfro surmised that Bigler had been in a fight and that the blood belonged to someone else.  Officer Renfro did not believe that appellant and Bigler were being truthful, but he let them go after writing appellant a ticket.

Later that morning, around 11:00 a.m., Cherrnay’s roommate discovered him dead on the floor of his bedroom and called 911.  When paramedics arrived at the house at 11:21 a.m., rigor mortis and lividity
(footnote: 4) had already set in.  Todd Youngblood, one of the paramedics who responded, said that he suspected foul play because of the state of Cherrnay’s room, particularly the broken glass everywhere.

Officer Gary Allen Fernandez, a detective, also investigated Cherrnay’s death.  When Officer Fernandez arrived at the house, he knew immediately that Cherrnay had not died of natural causes.  There was a large amount of blood and broken glass on the bed and a broken acoustic guitar next to Cherrnay’s body.

Officer David Taylor, a crime scene investigator, processed the scene.  He found that the inside of Cherrnay’s bedroom window was broken and there was blood on a guitar stand in the room.  Cherrnay’s body was on the floor.  Although there was not much blood underneath Cherrnay’s body, there was blood on his back and legs.  Cherrnay had been stabbed in his right back hip, and the blood had flowed down his legs.  Thus, it appeared Cherrnay had been standing or sitting up while he was bleeding.  Officer Taylor described long, thin, bruising-type wounds on the right side of Cherrnay’s body, which to Officer Taylor, made it appear that someone had beaten Cherrnay on the right side while he was lying on his left side.  Officers also found a watch in the room that was later identified as appellant’s.

Dr. Daniel Konzelmann, the medical examiner who performed the autopsy on Cherrnay, testified that he determined Cherrnay’s death was caused by “blunt force injuries with stab wound of buttock.”  According to Dr. Konzelmann, upon his external examination of Cherrnay, he noted “a number of injuries of different types”:  blunt force injuries, scratches, a “sharp-force” wound on the right buttock, and a “sharp-force, shaved-type” wound on the left lower arm.
(footnote: 5)  Among these wounds were the striped wounds observed by Officer Taylor, which Dr. Konzelmann described as “a series of linear paired abrasions down the right side of the body,” some of which were parallel to each other and some of which were at angles to each other; in other words, some of the striped wounds crossed each other.  Dr. Konzelmann counted thirty-four of these type of wounds.  Dr. Konzelmann opined that these wounds were caused by something long and relatively thin that was probably rounded with no sharp edges.  He said that such wounds would be consistent with being inflicted by the shaft part of a golf club as opposed to the head.  Dr. Konzelmann stated that these wounds by themselves would not have been immediately life-threatening but that they could have become more serious given time.  But he also stated that these wounds could potentially be caused by a weapon capable of causing death or serious bodily injury.  He also opined that these blunt-force injuries, together with the stab wound, were the result of acts clearly dangerous to human life. 

Dr. Konzelmann also found about eight blunt-force wounds on the skin of Cherrnay’s head and scalp, a little bruise on his inner lip, a scratch on the forehead, and a pair of one-eighth inch round abrasions over the right chest, with a bruise in between and a tear in the muscle with some minor soft tissue bleeding underneath the bruise. 

Dr. Konzelmann found the stab wound on Cherrnay’s right buttock.  According to Dr. Konzelmann, the stab wound by itself was the result of an act clearly dangerous to human life.  The stab wound “wasn’t all that far” from the striped wounds on Cherrnay’s right side; the stab wound was more toward the back, and the striped wounds were more toward the side and front.  The stab wound was in a V-shape, which usually indicates that when the object was in the victim, it was turned or the victim turned.  This wound could have been caused by “[a]nything long and straight and sharp [and] thin.”  According to Dr. Konzelmann, none of the evidence he received from the scene—including pieces of glass and the guitar stand—was consistent with having caused that wound.   Dr. Konzelmann believed that the shaved-type wound occurred after or very near Cherrnay’s death because it bled minimally.  The lack of bleeding meant that Cherrnay’s blood pressure had dropped significantly.

On cross-examination, Dr. Konzelmann admitted that the blunt-force trauma injuries by themselves did not cause Cherrnay’s death.  He also agreed that he could not tell whether the stab wound was caused intentionally or whether Cherrnay fell on a piece of glass.  Dr. Konzelmann agreed that some of the face and head wounds were consistent with being hit by a fist.  He also stated that he could not find where the stab wound had crossed any major blood vessels;
(footnote: 6) he estimated that it took probably fifteen or twenty minutes for Cherrnay to “bleed out” from the stab wound. 

After an investigation led police to appellant and Bigler, Investigator Jeremy Chevallier took appellant’s videotaped statement on July 9, 2003 at the police station.  The videotape was published to the jury at trial. 

In the video, appellant initially denied any involvement in Cherrnay’s death and gave a different explanation for the abrasions on his hand.  However, after further questioning, he told the police that he and Bigler drove to Cherrnay’s house around 2:30 a.m. on July 3, 2003 after leaving Erik’s house and dropping Dawn off at hers.  Appellant and Bigler each had with them a golf putter from Dawn’s garage.
(footnote: 7)  According to appellant, he and Bigler took the putters with them for protection because they did not know if Cherrnay’s roommates would be home.

Appellant and Bigler parked two or three streets over from Cherrnay’s house and walked to it.  When they arrived, they knocked on the door about eight times and then went around the house to a back sliding glass door, which was open.  They looked around “for a bit” because they did not know where Cherrnay was.  When they opened up the door to Cherrnay’s bedroom, it was dark because the lights were off.  They said, “Bobby,” and he raised up.

Appellant said that he and Bigler went into the room at the same time and that everything happened quickly.  According to appellant, his putter hit the wall and snapped in half, so he dropped it and “went straight for [Cherrnay’s] head.”  He also said that Bigler’s putter broke, but he did not know when.  Appellant admitted hitting Cherrnay in the head five or six times with his fists and hitting him with a guitar.  He said that Cherrnay fought back and was scratching and biting.

Appellant told the police that he did not know what Bigler was doing during the assault because the room was dark, but he said he remembers putting Cherrnay in a headlock and that Cherrnay was trying to get up, but he was lying on top of him holding him down.  Appellant also said that he did not remember any glass breaking in the room.

When the assault was over, appellant said that he got up and looked around the room for anything he could pick up as evidence.  He and Bigler found the putters they had brought.  Cherrnay was facedown on the bed.  They told him not to move or look at them, and he said, “Yes sir, I won’t move.”  Appellant stated that there was some blood on Cherrnay’s back but he did not notice any cuts; however, he also said that Cherrnay was naked.

The two left the house through the same sliding glass door and went to the parked car.  They threw out the putters somewhere between Cherrnay’s house and Dawn’s house, where they went afterward.  Officer Renfro stopped them before they got to Dawn’s house.  After going to Dawn’s, appellant took Bigler home.  Appellant later threw away the clothes he was wearing that night.

Investigator Chevallier testified that appellant’s statements on the video are inconsistent with the types of visible injuries inflicted on Cherrnay because “[t]here appear to be a lot more bruises than five or six” on Cherrnay’s body.  Investigator Chevallier found it hard to believe that appellant did not know what Bigler was doing during the assault “based on the fact that there was one body, there was one person they were fighting and hitting.  It would be hard for me to believe that they didn’t know what each other was doing at the time.” 

Investigator Chevallier also stated that appellant’s statement that he did not hear any glass breaking is inconsistent with photographs of the scene because there were broken bottles on the bed and broken glass on the floor and bed and around the room.  According to Investigator Chevallier, appellant’s claim that he did not know about any stab wound was also inconsistent because of the amount of blood and the actual wound on the back.  Investigator Chevallier said that from his experience, the wound looked like a puncture wound and could have been made by either someone stabbing Cherrnay or by Cherrnay rolling around on a piece of glass while fighting appellant and Bigler. 

Investigator Chevallier also said that it would be improbable for one person to have made all the blows attributable to a long, thin object such as a golf club because the bruises from those blows were at different angles and looked like they were made from opposite directions.  The majority of the stripes were on one side of the body, but some of them intersected and overlapped. 

Analysis

The Court of Criminal Appeals has “long held that when the trial court submits a jury charge setting out alternate means of committing an offense (or alternate ways to prove a specific element), the evidence is sufficient to support a general verdict of guilty of the statutory offense if the evidence is sufficient to prove any one of those alleged means.”  
Bagheri v. State
, 119 S.W.3d 755, 761 n.5 (Tex. Crim. App. 2003).  Here, appellant was charged with four different methods of committing murder as either a principal or a party; he challenges only the sufficiency of the evidence to prove intent to kill or cause serious bodily injury.  Specifically, appellant contends that because each of Cherrnay’s injuries alone could not have killed him and that because there is evidence that the stab wound 
could have been
 accidentally inflicted, the evidence is insufficient to show an intent to kill or seriously injure.

However, evidence of an intent to kill is not necessary to uphold the jury’s verdict in this case.  The medical examiner testified that the thirty-four striped wounds could have become serious given time and that all of Cherrnay’s wounds were the result of someone committing an act clearly dangerous to human life.  Accordingly, whether any one of those wounds was the actual cause of Cherrnay’s death is irrelevant.  
Cf. Umoja v. State
, 965 S.W.2d 3, 5-6 (Tex. App.—Fort Worth 1997, no pet.) (holding that evidence was factually sufficient to support murder conviction when appellant was one of several people beating and kicking victim).  By appellant’s own admission, he and Bigler entered Cherrnay’s house without permission and assaulted him.
(footnote: 8)  Appellant even admitted to holding Cherrnay down on the bed.  The jury was entitled to disbelieve appellant’s statements that he did not know what Bigler was doing during the assault and that he dropped the putter he was carrying after it broke against the wall.  The nature and amount of wounds on Cherrnay’s body evidences an act clearly dangerous to human life.  Thus, the evidence is sufficient to support the jury’s verdict under section 19.02(b)(3) of the penal code.

Moreover, we believe that there is also sufficient evidence of appellant’s intent.  The sheer volume of the wounds inflicted on Cherrnay and the fact that they were inflicted by some type of object used as a weapon indicates intent.  Appellant’s prior planning of the assault—which included taking the putters from Dawn’s garage, concealing his actions from Dawn, and parking several streets away from Cherrnay’s house—indicates intent.  And, finally, the fact that appellant and Bigler took and disposed of only the golf clubs—while leaving appellant’s watch behind—indicates a consciousness of guilt, especially with respect to the use of those items against Cherrnay.  
See Claxton
, 124 S.W.3d at 766; 
see also LaPoint v. State
, 750 S.W.2d 180, 189 (Tex. Crim. App. 1986) (holding that appellant’s attempt to explain his presence in closed store to officer showed consciousness of guilt and, therefore, culpable intent).

Accordingly, we conclude and hold, according to the appropriate standards of review, that the evidence is both legally and factually sufficient to support appellant’s conviction for murder.  We overrule appellant’s first and second points.

Manslaughter Instruction

In his third point, appellant contends that the trial court erred by refusing to include an instruction in the charge on the lesser-included offense of manslaughter.  Specifically, in his videotaped statement, appellant said that he did not intend to kill Cherrnay, that he only struck Cherrnay five to six times with his hands, that appellant did not know what Bigler was doing during the fight, and that Cherrnay was talking to them as they were leaving.  According to appellant, this evidence at least raised a fact issue on manslaughter.

Applicable Law

We use a two-pronged test to determine whether a defendant is entitled to an instruction on a lesser-included offense.  
Rousseau v. State
, 855 S.W.2d 666, 672-73 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 919 (1993); 
Royster v. State
, 622 S.W.2d 442, 446 (Tex. Crim. App. [Panel Op.] 1981) (op. on reh’g).  First, the lesser-included offense must be included within the proof necessary to establish the offense charged.  
Salinas v. State
, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005);  
Rousseau
, 855 S.W.2d at 672-73; 
Royster
, 622 S.W.2d at 446.  Second, some evidence must exist in the record that would permit a jury to rationally find that if appellant is guilty, he is guilty only of the lesser offense.  
Salinas
, 163 S.W.3d at 741; 
Rousseau
, 855 S.W.2d at 672-73; 
Royster
, 622 S.W.2d at 446.

Appellant asked that the jury be given an instruction on manslaughter under section 19.04 of the penal code, which provides that “[a] person commits an offense if he recklessly causes the death of an individual.” 
 
Tex. Penal Code Ann
. § 19.04(a).  A person acts recklessly when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur.  
Id
. § 6.03.   

Manslaughter is a lesser-included offense of murder.  
Cardenas v. State
, 30 S.W.3d 384, 392-93 (Tex. Crim. App. 2000); 
Montgomery v. State
, 198 S.W.3d 67, 91 (Tex. App.—Fort Worth 2006, pet. ref’d).  Thus, the first prong of the 
Rousseau
 test has been met, and we must decide whether the record contains some evidence that would permit a jury to rationally find that appellant is guilty only of the lesser-included offense of manslaughter.  
Rousseau
, 855 S.W.2d at 672-73; 
Montgomery
, 198 S.W.3d at 91.

For a defendant to be entitled to a jury charge on manslaughter, the record must contain some evidence that the defendant did not intend to kill 
and
 that the defendant acted recklessly, i.e., that he consciously disregarded a substantial and unjustifiable risk of death of which he was aware. 
 Tex. Penal Code Ann.
 § 6.03; 
Kennedy v. State
, 193 S.W.3d 645, 651 (Tex. App.—Fort Worth 2006, pet. ref’d) (en banc) (op. on reh’g);
 see Munoz v. State
, 932 S.W.2d 242, 245 (Tex. App.—Texarkana 1996, no pet.).

Analysis

Here, there is no evidence that when appellant participated in the assault on Cherrnay, he was aware of the risk of death but consciously disregarded it.  To the contrary, the evidence pointed to by appellant shows that he did not appreciate the risk of death.  According to appellant, he hit Cherrnay only five or six times with his fists; did not hit him with the putter or any other long, thin object; and he did not know what Bigler was doing during the assault.  Thus, there is no evidence showing that appellant consciously disregarded a known risk of death of which he was aware.  Therefore, we hold that there is no evidence 
that would have permitted a jury to rationally find that appellant was guilty only of manslaughter and that the trial court did not err by refusing such an instruction.  
We overrule appellant’s third point.

Conclusion

Having overruled appellant’s three points, we affirm the trial court’s judgment.

TERRIE LIVINGSTON

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.4(b)

DELIVERED: March 1, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
A more detailed factual background is set forth in the discussion of appellant’s first and second points.

3:
Dawn’s mother convinced Dawn to report the harassment and threats to the police.

4:
The pooling of blood in the part of the body lowest to the floor.

5:
It appeared that a thin layer of skin had been removed from Cherrnay’s arm.  Cherrnay was a tattoo artist and had tattoos all over his body.  He met Dawn when she went into the shop in which he worked to get a tattoo.

6:
Dr. Konzelmann testified that it was a little surprising that someone would “bleed out” from the stab wound based on its location.  According to Dr. Konzelmann, it is possible that a “somewhat smaller-sized or a medium-sized” blood vessel was cut that he could not find and that if enough of them are cut, a wound such as the stab wound could bleed briskly.

7:
Appellant initially denied that he took anything with him to Cherrnay’s.  He said that when he and Bigler dropped Dawn off at home, he told her he had to go to the bathroom; instead, he went to the garage, took the putters, put them in his car, then went back inside as if he had gone to the bathroom.

8:
Section 30.02(a)(1) and (3) of the penal code defines the offense of burglary as follows:

(a) A person commits an offense if, without the effective consent of the owner, the person:

(1) enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony, theft, or an assault; or

. . . .

(3) enters a building or habitation and commits or attempts to commit a felony, theft, or an assault.

Tex. Penal Code Ann.
 § 30.02(a)(1), (3) (Vernon 2003).